## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **RICHARD MEYER, Derivatively on Behalf of Nominal Defendant SPORTSLINE COM INC.,** ) ) ) ) | **Civil Action No.** **03 – 2288** CIV - GOLD |
| **Plaintiff,** ) ) | MAGISTRATE JUDGE SIMONTON |
| **v.** ) ) | |
| **MICHAEL LEVY, KENNETH W. SANDERS, GERRY HOGAN, SEAN MCMANUS, MICHAEL P. SCHULHOF, JOSEPH LACOB, ANDREW NIBLEY, JAMES C. WALSH, THOMAS CULLEN, RICHARD B. HORROW, and RUSSEL I. PILLAR,** ) ) ) ) ) ) ) ) | |
| **Defendants,** ) ) | |
| **and** ) ) | |
| **SPORTSLINE COM  INC.,** ) ) | **JURY TRIAL DEMANDED** |
| **Nominal Defendant.** ) ) | |

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

---

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of nominal defendant Sportsline Com Inc. ("Sportsline" or the "Company") against its entire Board of Directors and certain

*Verified Shareholder Derivative Complaint*                               - 1 -



current executive officers for breaches of fiduciary duties, other violations of common law, and for remedies pursuant to the Sarbanes-Oxley Act of 2002 during the Relevant Period from May 15, 2001 to the present. Sportsline is an internet sports company and publisher of CBS Sportsline.com.

2.     During the Relevant Period[1], the Individual Defendants caused the Company to hide expenses and improperly classify its discontinued operations in order to post a positive EBITDA, in violation of Generally Accepted Accounting Principals ("GAAP"), caused the Company to fail to disclose that the Company's MVP.com store was failing to make a profit, caused the Company to fail to disclose that its core strategy of generating revenue through its advertising base and capitalizing on its strategic relationship with CBS was a failure, and caused the Company to fail to disclose that increased competition was preventing the Company's fantasy sports business from developing into a reliable revenue source.  As a result of the foregoing, the Individual Defendants caused the Company's financial statements that were filed with the SEC and published during the Relevant Period to fail to be prepared in accordance with GAAP.  Further, the Individual Defendants caused the Company to materially overstate its reported financial results during the Relevant Period.  Finally, Individual Defendants Levy and Sanders violated the mandates of the Sarbanes-Oxley Act  after it became law in 2002.

---

[1]

The term "Relevant Period" shall refer to the period between May 15, 2001 and the present, but should not be interpreted as the only time period for which relevant documents may exist.  Indeed, Plaintiff specifically reserves his right to seek all documents which may lead to discoverable evidenced whether or not they were prepared or dated on days preceding of after the close of the Relevant Period.

3.      Throughout the Relevant Period, the Individual Defendants caused the Company to hide expenses and improperly classify its discontinued operations in order to post a positive EBITDA, in violation of GAAP.  Also, the Individual Defendants caused the Company to issue a series of false statements touting the Company's ability to leverage its resources and relationships with past and present e-commerce suppliers and develop additional revenue opportunities from its advertising base and fantasy sports business.  At the beginning of the Relevant Period the Individual Defendants caused the Company to tell the market that its operating results exceeded Wall Street expectations; that its advertising and marketing services business was maintaining profitability despite a challenging environment; that the Company was showing dramatic growth in all of its key audience metrics.  The Individual Defendants caused the Company to fail to disclose material information in its press releases and Form 10-Q's and 10-K's relating to: (i) the Company's inability to generate promised revenue from its advertising base and joint sales efforts with CBS; (ii) the increased competition in the fantasy sports market; and (iii) the lack of profitability of the MVP.com store.

4.      Throughout the Relevant Period, the Individual Defendants caused the Company to publicize (i) its expanding advertising base and its ability to mitigate overall diminished media spending; (ii) its long-stated goal of reaching positive EBITDA in the fourth quarter of 2002; (iii) strategic relationship with CBS; (iv) its successful integration of its fantasy products and their positive impact on the Company's overall growth and presence in the Internet sports media industry; and (v) consumer demand for its services and client commitment to it products.

5.      However, the Individual Defendants knew and caused the Company to fail to disclose that: (1) a positive EBITDA could only be achieved by the Individual Defendants causing the Company to hide expenses and improperly classify discontinued operations; (2) due to increased

*Verified Shareholder Derivative Complaint*                                    - 3 -

competition, the viability of the Company's fantasy sports business was not as significant a revenue source as they portrayed it to be; (3) revenue derived from advertising sales was diminishing and CBS was contributing significantly less advertising revenue than the Individual Defendants caused the Company to lead investors to believe; and (4) that MVP.com's assets did not yield promised value. Unfortunately for the Individual Defendants, the sham could not go on forever and they finally had the Company disclose that Sportsline's earnings were negatively impacted and that the Company would have to report losses due to accounting errors in the way they caused the Company to expense employee stock options, the reclassification of the Company's discontinued operations, a reduction in value of the Company's e-commerce operations acquired from MVP.com, and slower than expected recovery in online advertising. Defendants failed to disclose the magnitude of the above-mentioned problems in order to artificially inflate the Company's stock. The Company's stock price was crucial because it was necessary to fulfill Sportsline's 2003 obligation of $20 million to CBS[2] and to purchase Sandbox.com[3].

---

[2]     CBS and Sportsline entered into an agreement whereby CBS receives the Company's common stock in exchange for licenses of CBS trademarks, advertising and promotional consideration and sales opportunities. The agreement with CBS requires Sportsline, among other obligations, to issue to CBS $20 million worth of its common stock on each of April 1, 2003, July 1, 2004, October 1, 2005 and January 1, 2007. The number of shares that Sportsline issued to CBS on April 1, 2003 was limited to a number of shares that would not increase Viacom's beneficial ownership of Sportsline's outstanding shares above 39.9% while maintaining the aggregate payment amounts over the term of the agreement. On April 2, 2003, Sportsline announced that 5,454,428 shares of its common stock were issued to CBS Broadcasting Inc., a unit of Viacom Inc. The shares issued to CBS were valued at $5,399,884 and the remainder of the Company's 2003 obligation of $20 million was deferred until July 1, 2004. This issuance was based on Viacom's current ownership level and the number of shares of Sportsline common stock currently outstanding. *Therefore, is it apparent that the higher the value of Sportsline's stock, the greater the amount of the obligation the Company could pay.*

[3]     Although the agreement with Sandbox was eventually terminated due to Sandbox's breach of certain representations and covenants in the acquisition agreement, the Individual Defendants caused Sportsline to use its stock as payment for the acquisition.

6.      On September 26, 2003, the market was shocked when it was revealed that the Company was reducing its previous optimistic revenue and earnings forecasts for the third quarter and full year 2003 and that it was revealed that the Company was *restating its reported financial results for the past two and a half years*. Sportsline's stock price plummeted by more than 30%, or by $0.54 to $1.22, on volumes of about eight times the daily average. The Company was immediately hit by several securities fraud class action lawsuits filed on behalf of aggrieved investors.

7.      As a result of the Individual Defendants actions, the Company has lost millions of dollars in market value and lost credibility in the marketplace which damaged its goodwill. Moreover, the wrongful conduct of the Individual Defendants forced Sportsline to overpay millions of dollars in salaries, bonuses and other compensation to its executives. Furthermore, the conduct of the Individual Defendants has subjected the Company to the multiple securities fraud class actions referred to above, and internal investigations of the Company will cost the Company millions of dollars in costs and millions upon millions more to satisfy. Clearly, the Company has been damaged and will continue to suffer substantial damages due to the Individual Defendants' wrongful actions.

## PARTIES

8.      Plaintiff Richard Meyer is, and was at all times relevant hereto, a shareholder of nominal defendant Sportsline. He is a citizen of Illinois.

9.      Nominal defendant Sportsline is a corporation organized and existing under the laws of Delaware with its principal executive offices located at 2200 W. Cypress Road, Fort Lauderdale, FL 33309. Sportsline is an internet sports company and publisher of CBS Sportsline.com.

*Verified Shareholder Derivative Complaint*                                    - 5 -

10.     Defendant Michael Levy ("Levy") served as Sportsline's Chairman and Chief Executive Officer during the Relevant Period. Levy is a named defendant in the securities fraud class actions.

11.     Defendant Kenneth W. Sanders ("Sanders") has served as Sportsline's President of Finance and Administration and as CFO since January 2001. Sanders is a named defendant in the securities fraud class actions.

12.     Defendant Gerry Hogan ("Hogan") has been a director of Sportsline since November 1996. He is a member of the Compensation Committee.

13.     Defendant Sean McManus ("McManus") has been a director of Sportsline since March 1997. He is a member of the Compensation Committee.

14.     Defendant Michael P. Schulhof ("Schulhof") has been a director of Sportsline since November 1997. He was Chair of the Audit Committee until the appointment of Sherrill W. Hudson as a board member and Chair of the Audit Committee effective September 29, 2003.

15.     Defendant Joseph Lacob ("Lacob") has been a director of Sportsline since May 1995. He is a member of the Audit Committee.

16.     Defendant Andrew Nibley ("Nibley") has been a director of Sportsline since March 1996.

17.     Defendant James C. Walsh ("Walsh") has been as a director of Sportsline since August 1994.

18.     Defendant Thomas Cullen ("Cullen") has been a director of Sportsline since April 1997. He is a member of the Audit Committee.

19.     Defendant Richard B. Horrow ("Horrow") has been a director of Sportsline since September 1994.

20.     Defendant Russell I. Pillar ("Pillar") has been a director of Sportsline since March 2000.

21.     Individual Defendants are directors and/or officers of the Company.  Each of these directors and/or officers participated in the wrongdoing alleged in this Complaint, and approved and signed at least one of the false and misleading Annual Reports filed on Form 10-K with the SEC on March 26, 2002 and March 28, 2003 as further alleged herein.  Sanders and Levy signed the quarterly reports on Form 10-Q filed with the SEC on May 15, 2001, August 14, 2001, November 14, 2001, and May 13, 2002.  Further, Individual Defendants Levy and Sanders certified under the Sarbanes-Oxley Act of 2002 the quarterly reports filed on Form 10-Q with the SEC on August 14, 2002, November 13, 2002, May 13, 2003, and August 14, 2003.

22.     Defendants Levy, Sanders, Hogan, McManus, Schulhof, Lacob, Nibley, Walsh, Cullen, Horrow, and Pillar are collectively referred to herein as the "Individual Defendants."

## JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 15 U.S.C. § 1331, in that a federal question exits, and Rule 23.1 of the Federal Rules of Civil Procedure authorizing derivative actions by shareholders to remedy Individual Defendants' violations of state common law.

24.     This Court has jurisdiction over each defendant named herein.  Sportsline is a Delaware corporation with its principal place of business in this District.  A number of the other defendants are citizens or residents of Florida. This action is properly brought within this jurisdiction because Sportsline conducts business and maintains offices in this District, and a substantial part of

*Verified Shareholder Derivative Complaint*                                    - 7 -

the Individual Defendants' wrongful conduct took place in this District and the Individual Defendants have received substantial compensation in this District by doing business here.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors, and/or fiduciaries of Sportsline and because of their ability to control the business and corporate affairs of Sportsline, the Individual Defendants owed Sportsline and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage Sportsline in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sportsline and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Sportsline and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sportsline, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, and the content of various SEC filings.

27.     To discharge their duties, the officers and directors of Sportsline were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Sportsline were required to, among other things:

a.   ensure that the affairs of Sportsline were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.   exercise good faith in supervising the preparation and filing of all audits, reports, and other financial information required by law, including periodic financial statements and reports filed with the SEC and in examining and evaluating such audits, reports, and other information concerning the financial affairs of the Company; and

c.   ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public.

28.   As alleged in detail below, the Individual Defendants breached their fiduciary duties of loyalty, good faith, and due care by causing or allowing the Company to engage in a series of illegal and imprudent practices whereby Sportsline falsely and misleadingly reported artificially inflated financial results due to the Individual Defendants conduct in causing the Company to hide expenses and improperly classify its discontinued operations in order to post a positive EBITDA, in violation of GAAP, causing the Company to fail to disclose that its MVP.com store was failing to make a profit, causing the Company to fail to disclose that its core strategy of generating revenue through its advertising base and capitalizing on its strategic relationship with CBS was a failure, and causing the Company to fail to disclose that increased competition was preventing the Company's fantasy sports business from developing into a reliable revenue source.  As a result of the foregoing, the Individual Defendants caused the Company to suffer enormous damages.

## FACTUAL ALLEGATIONS

29.   According to a Sportsline press release, the Company was described as follows:

Sportsline is the leading edge of media companies providing Internet sports content, community and e-commerce. As the publisher of CBS SportsLine.com and the official Web sites of the NFL and the PGA TOUR, the Company serves as one of the most comprehensive sports information sources available, containing an unmatched breadth

*Verified Shareholder Derivative Complaint*                                    - 9 -

and depth of multimedia sports news, information, entertainment and merchandise. Sportsline also has strategic relationships with Major League Baseball and the NBA, and serves as a primary sports content provider for America Online. In 1999, the Company commenced operations in Europe through Sports.com Limited, Europe's leading Internet and mobile data provider of sports content.

### MVP.com

30.     On May 15, 2001, Dan Head, vice president of e-commerce for the Company, issued

a press release detailing the value of MVP.com.  Specifically, the press release stated:

> "We've proven our ability to convert our large audience of CBS SportsLine.com users into shoppers, by providing contextual merchandise links throughout the content on our award-winning site.  When you combine that success with the promotional leverage of USA Networks' impressive group of Internet businesses and ECS' state-of-the-art technology, we've got a powerful blend of assets to enable us to rapidly grow the MVP.com store."

> *   *   *

> "Revenue from transactions will inevitably grow into a larger piece of the total entertainment pie, both online and off, and we believe the new MVP.com site combines all the right features -- easy navigation, compelling content, expansive product selection, reliable customer services, and integrated marketing -- to give it broad appeal and real profit potential, the only way we know of doing transactions on the Internet."

31.     And in a September 22, 2003 press release, Head further commented:

> "We were able to leverage our resources and relationships with past and present e-commerce suppliers to limit exposure from an inventory standpoint, as well as minimize incremental expense and personnel."

32.     In fact, as detailed below, the Company misrepresented its e-commerce supplier's

ability to provide value to the Company and increase its revenues, resulting in increased expenses,

decreased profits, and other material charges.

## Fantasy Subscription Business and Advertising Sales

33.     On July 6, 2001, Sportsline revised its forecast for the quarter ended June 30, 2001.

Commenting on the revision, Individual Defendant Levy stated:

> "Our revised expectations are a result of a challenging business environment, in particular the domestic advertising market, coupled with the normal seasonality in our business."

34.     However, within five days of the revision, the Individual Defendants caused the

Company to issue a press release touting its multi-year agreement with The National Football League,

CBS, a unit of Viacom, and America Online:

> "It is gratifying that the NFL, AOL and CBS have once again acknowledged Sportsline's proven ability to successfully deliver on all fronts production, promotion and sales in particular - and we are proud to be a major part of this industry shaping deal."

> *   *   *

> "We are excited to once again extend and expand our strategic relationship with America Online," said Andrew Sturner, president, corporate and business development for Sportsline. "Through the extension of our existing relationship with America Online and our NFL alliance, also announced today, *Sportsline has expanded two major relationships that will serve as a catalyst for our future growth.*"

35.     Then, on October 3, 2001, Individual Defendant Levy added:

> "SportsLine.com is showing dramatic growth in all of its key audience metrics resulting from our *best of breed fantasy products*, our new relationship with the NFL and the promotion we receive from our long-time partners at CBS Sports and AOL. This growth in our targeted and demographically attractive audience as we move into October, the busiest sports month of the year featuring football, the baseball post-season and the beginnings of hockey and basketball, provides *excellent opportunities for advertisers* with Sportsline.com and our network of sites."

36.     On July 24, 2001, the Individual Defendants caused the Company to report second quarter 2001 results. The earnings release stated:

> Management expects domestic revenue for the full year 2001 to be approximately $60 million, with *advertising anticipated to account for approximately 85% of the domestic revenue base for the year.* In the third quarter of 2001, Sportsline expects domestic revenue to be between $12 and $13 million. The Company anticipates gross margins to range between approximately 50 and 60% during the second half of 2001.

37.     Commenting on the Company's business outlook, Individual Defendant Levy stated:

> "We are clearly poised with a huge market opportunity, a strong brand and *great strategic partners.* With our concentration on developing new revenue initiatives, preservation of capital and prudent spending, *we feel very good about our prospects as a viable sports media business despite the continued slowdown in advertising spending."*

38.     On September 19, 2001, the Individual Defendants caused a press release to be issued reporting the record number of single day traffic hits on its website.   Individual Defendant Levy stated:

> "These record-breaking numbers and our very targeted and attractive demographics provide *outstanding opportunities for advertisers* with Sportsline and our network of sites.  Our new relationship with the NFL, the promotion we receive from our long-time partners at CBS Sports and AOL, and our *increased emphasis on developing more and better fantasy products are clearly paying dividends."*

39.     A far cry from the revised estimates of July 6, 2001, on October 23, 2001, the Individual Defendants caused the Company to release its 3Q 2001 earnings.  The earnings release stated:

> *Financial results for the quarter exceeded the most recent expectations of Wall Street analysts,* while audience metrics established records in traffic, reach and time spent per user.

> \*   \*   \*

Sportsline generated $12.0 million in domestic advertising revenue during the third quarter, which represents a 44% sequential increase over second quarter domestic advertising revenue and a slight increase over pro forma domestic advertising revenue of $11.6 million in the third quarter 2000.

\* \* \*

In the fourth quarter of 2001, the Company expects revenue to be between $14 and $15 million, approximately 90% of which is expected to be advertising revenue.

\* \* \*

*The Company estimates the 2002 revenue base will grow by approximately 20 to 30 percent over 2001.*

40.    Commenting on this earnings release, Individual Defendant Levy stated:

"The results for the quarter are evidence of the strength of our service and product offering. Our operating results exceeded Wall Street expectations, *we were able to generate both year-over-year and sequential growth in advertising revenue*, and we exhibited record-setting traffic and reach. There is a clear opportunity for Sportsline to leverage its strong brand and great strategic partners in order to maximize its growth potential, and continue on its path to cash flow break-even."

41.    And in a November 15, 2001 and January 28, 2002 press release, respectively, Individual Defendant Levy stated:

"We are extremely encouraged as *we continue to gain traction from* our NFL and AOL deals, our *CBS promotion and fantasy football*. The combination of our strong reach, targeted demographic, user loyalty and the creativity of our sales group allows Sportsline to provide advertisers with an outstanding opportunity to market their products and brands."

\* \* \*

"We are extremely pleased that Sportsline is once again recognized by our peers for not only producing the best sports Web sites, but also for our ability to forge extremely valuable partnerships with other industry leaders."

42.    On January 29, 2002, the Individual Defendants caused the Company to release its 3Q 2001 earnings.  The earnings release stated:

*Verified Shareholder Derivative Complaint*                                      - 13 -

Financial results for the quarter exceeded the most recent expectations of Wall Street analysts, while audience metrics established records in traffic and reach.

* * *

*Sportsline advertising revenue increased both sequentially and year-over-year* to $13.7 million in the fourth quarter of 2001, compared with $12.0 million in the third quarter of 2001, and pro forma advertising revenue of $13.1 million in the fourth quarter of 2000.

* * *

Management expects total revenue for the full year 2002 to be in the range of $68 to $72 million, which would represent a growth rate of approximately 20-25% over 2001 pro forma revenue.

* * *

The Company anticipates that approximately 85% to 90% of total revenue in 2002 will come from advertising and marketing services.

43.     Individual Defendant Levy added:

"It is clear from our strong performance in the final quarter of 2001 that Sportsline successfully navigated through a very challenging year, and *has strong momentum heading into 2002.* Our operating results for the quarter again demonstrate that despite overall diminished media spending, our clients remain committed to our products and we remain committed to prudently managing the business toward positive cash flow."

44.     On February 26, 2002, the Individual Defendants caused the Company to comment

on its relationship with CBS. The press release stated:

Unlike most of the dot coms, we continue to flourish for a couple of reasons: we have always concentrated our ad sales efforts on the traditional television sports sponsors instead of other dot coms, and we preserved our cash by *utilizing strategic relationships with CBS,* AOL and Westwood One Radio and many others to promote our site rather than expensive television ad provided the funding necessary to get started.

45.     On April 29, 2002, the Individual Defendants caused the Company to release its 1Q

2002 earnings. The earnings release stated:

*Verified Shareholder Derivative Complaint*                                                    - 14 -

Sportsline advertising revenue was $14.6 million for the first quarter 2002, a 7% increase over the $13.7 million recorded in the fourth quarter of 2001.

\* \* \*

The conversion of the fantasy baseball league management product back to a fee-based product has resulted in approximately $1.5 million in billings, which will be recorded as revenue primarily in the second and third quarters. Approximately 12,000 paid leagues have been formed, more than twice as many paid leagues as in 2000, the most recent year for previous pay fantasy baseball products. In addition, approximately 8,000 fantasy baseball teams have been formed for our other premium pay products. *Based on the positive results from fantasy baseball sign-ups, the Company anticipates fantasy football revenue in the second half of the year to be at least two to three times greater than fantasy baseball revenue.*

\* \* \*

Also consistent with previous guidance, the Company expects to reach positive EBITDA in the fourth quarter of 2002.

46.    On July 25, 2002, the Individual Defendants caused the Company to release its 2Q 2002 earnings. The earnings release stated:

*Sportsline launched its fee-based fantasy football products earlier this month, with the anticipation that revenue would be at least two to three times greater than fantasy baseball revenue. In less than three weeks, the sales trends have been very positive, as fantasy football revenue is already roughly the same as what the Company billed for the entire fantasy baseball season.*

\* \* \*

Domestic advertising and marketing services revenue increased 11%, to $9.4 million in the second quarter of 2002 compared to $8.5 million in the same quarter of 2001.

\* \* \*

Consistent with previous guidance, the Company expects to achieve positive EBITDA in the fourth quarter of 2002.

\* \* \*

The Company anticipates that approximately 80 to 85% of total revenue in 2002 will come from advertising and marketing services.

47.    Individual Defendant Levy added:

"We're feeling very good about our business as we head into the strongest time of the year for our company.  I am pleased that *we were able to exceed domestic advertising revenue in this quarter* compared to a year ago, unlike many other media companies who are struggling to show any growth at all. Our subscription and premium products revenue has gained traction with our fee-based fantasy football ramping up nicely, our direct marketing initiatives are continuing to grow, *the advertising marketplace is showing positive signs* and the sports calendar is coming to its busiest time of the year."

48.    On October 22, 2002, the Individual Defendants caused the Company to release its

3Q 2002 earnings.  The earnings release stated:

Sportsline reported an increase in cash and marketable securities of $7.6 million, primarily resulting from the advance collection of fantasy and certain advertising revenue.

* * *

Revenue for the third quarter of 2002 was $15.5 million, an increase of 14% compared to $13.6 million in the same quarter of 2001, and a sequential increase of 41% compared to $11.0 million in the second quarter of 2002.

* * *

The success of the Company's fee-based fantasy football strategy contributed to the rise in subscription and premium products revenue to $3.7 million in the third quarter 2002, a 185% increase compared to $1.3 million in the same period a year ago and a 131% sequential increase compared to $1.6 million in the second quarter of 2002.

* * *

*Advertising and marketing services revenue increased 25% sequentially* compared to the second quarter of 2002.

* * *

Revenue for the third quarter of 2002 was $15.5 million, compared to the $13.6 million recorded in the same quarter of 2001, an increase of 14%. Compared to second quarter 2002 revenue of $11.0 million, the sequential increase is 41%.

* * *

*Verified Shareholder Derivative Complaint*                                    - 16 -

The preliminary outlook for 2003, which is subject to change, currently calls for revenue growth in the 15% range for the full year.

\* \* \*

The Company anticipates the total revenue base in 2003 to be split approximately 75% advertising and marketing services and 25% subscription and premium products, with subscription and premium products revenue expected to grow more than 30% over 2002.

49.     Individual Defendant Levy commented:

"This quarter is indicative of the strength of Sportsline's business as we made significant strides in the right direction in all of our major financial metrics: net loss, EBITDA and revenue. We have put Sportsline in position to achieve our long-stated goal of reaching positive EBITDA in the fourth quarter. We continue to efficiently manage the expense side of our business while on the revenue side, *our advertising and marketing services business is more than holding its own in a challenging environment. Furthermore, we have successfully proven the viability of our fantasy sports business as a significant revenue source, as we have already generated in excess of $10 million year-to-date from fantasy sports.*"

50     On January 30, 2003, the Individual Defendants caused the Company to release its 4Q

2002 earnings. The earnings release stated:

The Company estimates that total revenue for the full year 2003 will be in the $68-$72 million range, representing a growth rate of approximately 10-15% over reported revenue in 2002.

\* \* \*

For the first quarter of 2003, the Company expects total revenue in the $12 to $13 million range, with approximately 90% of first quarter revenue to come from advertising and marketing services.

51.     Individual Defendant Levy added.

"Eighteen months ago, we established the goal of achieving positive EBITDA for the first time in this final quarter of 2002, then we proceeded to execute our plan. This achievement is the strongest indication yet of both the viability of Sportsline's business model and our ability to execute on it. We made dramatic progress this past year in diversifying our revenue, while continuing to manage our costs effectively. These

*Verified Shareholder Derivative Complaint*                                    - 17 -

results clearly demonstrate that Sportsline is squarely positioned as a leader for years to come in the Internet media and services industry."

52.     On April 24, 2003, the Individual Defendants caused the Company to release its 1Q 2003 earnings. The earnings release stated:

The quality of the Company's advertising revenue base continues to develop, as more than 40% of advertising revenue for the first quarter of 2003 came from Fortune 500 clients.

*   *   *

Revenue generated through joint sales efforts with CBS represented approximately 18% of the Company's total advertising sales in the quarter ended March 31, 2003, compared to 7% in the same quarter a year ago.

*   *   *

More than 75% of the Company's sales target for the second quarter of 2003 has been met. These favorable back-log results have allowed the Company's sales team to begin focusing efforts on events of the second half of the year, including the NFL season, earlier than in previous years.

*   *   *

In the first quarter of 2003, the Company generated $2.3 million in fantasy baseball billings, which will be recognized as revenue primarily in the second and third quarters of 2003. *This represents a 53% increase over the $1.5 million in total fantasy baseball revenue in 2002.*

*   *   *

The Company expects approximately 80-85% of second quarter 2003 revenue from continuing operations to come from advertising and marketing services. The Company anticipates that for the full year 2003, approximately 70-75% of total revenue from continuing operations will be from advertising and marketing services, and 25-30% is expected from subscriptions and premium products, with seasonal fluctuations anticipated from quarter to quarter.

*Verified Shareholder Derivative Complaint*                                    - 18 -

53.    Individual Defendant Levy commented:

"We made considerable progress toward our goal of achieving positive cash flow for the full year. The significant year-over-year improvements we made this quarter are the result of our focus on both the core media and subscription businesses and the ability of management to continue to execute on our plan."

54.    On July 17, 2003, Individual Defendant Levy further stated:

"Working together with the NFL to offer a selection of our fee-based fantasy football products directly to NFL.com users will enable *Sportsline to grow our fantasy business faster and more effectively*. We've enjoyed a great relationship with the NFL and are looking forward to expanding it with this new agreement. *This provides us with another catalyst to ensure we reach our targets both in terms of subscribers and revenue produced.*"

55.    On July 24, 2003, the Individual Defendants caused the Company to release its 2Q 2003 earnings.  The earnings release stated:

Advertising trends for the second half of the year are positive as approximately 60% of the Company's sales target for the third quarter and nearly 50% of the fourth quarter target already have been met, consistent with expectations.

*   *   *

The Company generated $2.6 million in fantasy baseball billings this year, which is being recognized as revenue in the second and third quarters of 2003. *This represents a 68% increase over the $1.5 million in total fantasy baseball revenue in 2002.*

*   *   *

More than 18,000 paid fantasy baseball leagues were sold this ear, approximately 40% greater than the approximately 13,000 sold last year.  The number of paid teams has increased from approximately 150,000 in 2002 to approximately 240,000 teams in 2003, representing a 60% increase.

*   *   *

The Company expects approximately 70-75% of both third quarter and full year 2003 revenue to come from advertising and marketing services, and 25-30% from subscriptions and premium products, with seasonal fluctuations anticipated from quarter to quarter.

*Verified Shareholder Derivative Complaint*                              - 19 -

56.     Individual Defendant Levy added:

"Sportsline again experienced steady growth in all areas this quarter, continuing on our course to achieve positive cash flow in the second half of the year. We're seeing very positive trends both in our fantasy subscription business and in advertising sales as we head into what is traditionally the strongest time of the year for our company. We are also excited about some recently developed additional fantasy revenue opportunities, including our expanded NFL agreement."

57.     The Individual Defendants made or caused the Company to make false and misleading statements touting that the Company's: (i) expanding advertising base and its ability to mitigate overall diminished media spending; (ii) long-stated goal of reaching positive EBITDA in the fourth quarter of 2002; (iii) strategic relationship with CBS; (iv) successful integration of its fantasy products and their positive impact on the Company's overall growth and presence in the Internet sports media industry; and (v) consumer demand for its services and client commitment to its products.

58.     The statements from the press releases and quarterly reports detailed above were each materially false and misleading when issued as they misrepresented and/or omitted the following adverse facts which then existed, the disclosure of which was necessary to make the statements made not false and misleading, including: (i) the Company's inability to generate revenue from its advertising base and joint sales efforts with CBS; (ii) the Company's outlook on its fantasy sports business and overall competition in the fantasy sports market; and (iii) the lack of profitability of the MVP.com store.

59.     The Individual Defendants were aware of the foregoing because they closely monitored the Company's advertising business, revenue and pipeline visibility with the Gomez Performance Network[4] and Solbright's AdSuite[5].

---

[4]        Gomez, Inc. delivers web site performance monitoring services to Sportsline. "We chose Gomez Performance Network due to its greater ease of use, additional functionality and greater value for our investment," stated Dan Leichtenschlag, president of operations, CTO of Sportsline. "Gomez provides tools that allow us to continuously monitor and measure our performance, which helps Sportsline ensure its users have the best experience on the Web."

*Verified Shareholder Derivative Complaint*                                    - 20 -

60.     Item 303(a)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

61.     Paragraph three of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (a) matters that would have an impact on future operations and have not had an impact in the past . . .

62.     Notwithstanding these requirements, at no time during the Relevant Period did the Individual Defendants fully discuss or cause the Company to fully discuss, in the Company's public filings with the SEC, as required by the preceding SEC Regulation, the Company's slow recovery in online advertising, the decrease in value of its e-commerce operations, the disappointing ad revenue from joint sales efforts with CBS, or the more-competitive fantasy sports market. in the Company's public filings with the SEC, as required by the preceding SEC Regulation.

---

<sup>1</sup>     Sportsline received, from Solbright, an advertising management system that is fully integrated to provide complete management of the advertising sales, trafficking, billing, delivery and reporting processes. Solbright's AdSuite also delivers detailed management and revenue reporting which helps executive staff to better understand sales pipelines, customer contracts, and revenue recognition and allocation. According to Mark Mariani, president of sales and marketing for Sportsline, "We selected Solbright to enhance our order management system because it has the ability to handle the intricacies of our advertising business while providing executive management with revenue reporting and pipeline visibility."

*Verified Shareholder Derivative Complaint*                                                      - 21 -

63.     The Individual Defendants caused Sportsline to include its false and incorrect financial statements and results in press releases and in its Form 10-Qs and Form 10-Ks for filed with the SEC between May 15, 2001 and August 14, 2003.  These SEC filings represented that the financial information presented therein was a fair statement of Sportsline's financial results and that the results were prepared in accordance with GAAP.

64.     These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Sportsline's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

65.     Regulation S-X [17 C.F.R. Sec.210.4-01(a)(1)] states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual financial statements.

66.     Due to these accounting improprieties, Sportsline was caused to present its financial results in a manner which violated GAAP, including the following fundamental accounting principles:

        A.     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No.1, para. 34)

B.      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, para. 40);

C.      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and the public in general (FASB Statements of Concepts No. 1, para. 50);

D.      The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, para. 42);

E.      The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, paras. 58-59);

*Verified Shareholder Derivative Complaint*                                                   - 23 -

F.      The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, para. 79); and

G.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, paras. 95, 97).

67.      Further, the undisclosed adverse information concealed by the Individual Defendants during the Relevant Period is the type of information which because of SEC regulations, regulations of the national stock exchanges and customary business practices, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

68.      Plaintiff brings this action derivatively in the right and for the benefit of Sportsline to redress injuries suffered and to be suffered by Sportsline as a result of the breaches of fiduciary duty, and other violations of law by the Individual Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

69.      Plaintiff will adequately and fairly represent the interests of Sportsline and its shareholders in enforcing and prosecuting its rights.

*Verified Shareholder Derivative Complaint*                                    - 24 -

70.     Plaintiff is an owner of Sportsline common stock and was an owner of Sportsline common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

71.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Sportsline Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

A.     Each of the Individual Defendants participated in, approved or recklessly disregarded the wrongs complained of herein, which could not have been an exercise of good faith business judgment;

B.     Individual Defendant Levy is not disinterested nor independent because he is named as defendant in the securities fraud class actions;

C.     Individual Defendants Levy, Hogan, McManus, Schulhof, Lacob, Nibley, Walsh, Cullen, Horrow, and Pillar approved and signed the false and misleading Annual Report filed on Form 10-K with the SEC on March 26, 2002 and March 28, 2003. Also, Levy approved and signed the 10-Q's filed with the SEC on May 15, 2001, August 14, 2001and May 13, 2002. Further, Levy as President and Chief Executive Officer (Principal Executive Officer) approved and signed the Certifications mandated by the Sarbanes-Oxley Act of 2002 for the 10-Q filed August 14, 2002, November 13, 2002, May 15, 2003, and August 14, 2003, as well as the approving and signing the Certification submitted with the 10-K filed with the SEC on March 28, 2003.

Thus, all of the directors except for new director Sherrill (who is not named as an Individual Defendant) are not disinterested nor independent;

D.     All of the directors of Sportsline named as Individual Defendants continue to serve as directors of Sportsline and comprise a majority of the Board. Thus, in order to bring this action for breaching their fiduciary duties, the directors would be required to sue themselves and/or their fellow directors who are their friends and with whom they have entangling alliances and interlocking business relationships, interests, and dependencies;

E.     Despite their knowledge of the wrongdoing alleged herein, the directors of Sportsline have not taken action to seek recompense from the wrongdoers who have caused harm to the Company.

F.     The Individual Defendants have not offered to reimburse the Company for the bonuses and incentive-based compensation they each received via their wrongful conduct.

G.     Sportsline's directors' and officers' liability insurance coverage has an "insured vs. insured" exclusion. Thus, if the Individual Defendants caused Sportsline to sue its officers and directors for the liability asserted in this case, they would not be insured for that liability. They will not do this to themselves. The Sportsline officers' and directors' liability insurance was purchased and paid for with corporate funds for the protection of the corporation. This derivative action does not trigger the "insured vs. insured" exclusion, and therefore only

this derivative action can obtain a recovery from Sportsline's officers' and directors' insurance for the benefit of the corporation.

## C O U N T  I
## AGAINST ALL INDIVIDUAL DEFENDANTS
## FOR BREACHES OF FIDUCIARY DUTIES

72.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

73.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Sportsline was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements.

74.     Each of the Individual Defendants violated the fiduciary duties of loyalty, good faith, and due care by knowingly causing or allowing the Company to engage in the unlawful and imprudent conduct alleged herein.

75.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Sportsline has sustained damages, as alleged herein.

## C O U N T  II
## CONTRIBUTION AND INDEMNIFICATION

76.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

77.     Sportsline is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Individual Defendants' liability to Sportsline.

78.     Sportsline's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and Sportsline is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are or may in the future be asserted against Sportsline by virtue of the Individual Defendants' misconduct.

**C O U N T  III**
**AGAINST DEFENDANTS LEVY AND SANDERS**
**PURSUANT TO 15 U.S.C. § 7243 (SARBANES-OXLEY ACT)**

79.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

80.     Based upon the allegations made above and pursuant to 15 U.S.C. § 7243, Sportsline is entitled to reimbursement of all bonuses and other incentive-based or equity-based compensation paid to Levy and Sanders, and any profits realized from the sale of Sportsline securities by them.

**C O U N T  V**
**AGAINST DEFENDANTS LEVY AND SANDERS**
**FOR BREACHES OF FIDUCIARY DUTY ARISING OUT OF THE PAYMENT OF**
**INCENTIVE COMPENSATION**

81.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

82.     Levy and Sanders received incentive based compensation based upon the financial performance of the Company which they knew was artificially inflated due the reasons alleged herein. They each owed a fiduciary duty to the Company not to receive such incentive based compensation based upon their own wrongful conduct, and thus they proximately caused and are continuing to cause substantial damage to the Company.

*Verified Shareholder Derivative Complaint*                              - 28 -

83.     As such, Levy and Sanders are liable and must account to Sportsline for any and all incentive based compensation paid or to be paid to them unlawfully derived from their breaches of fiduciary duty.

**WHEREFORE**, plaintiff demands judgment as follows:

A.     Determining that this action is properly maintainable as a shareholder derivative action pursuant to Rule 23.1 of the Federal Rules of Civil Procedure;

B.     Declaring and determining that Sportsline has been injured by reason of Levy and Sanders failure to disgorge to the Company their bonuses and equity-based compensation received, and trading profits made, in the twelve-month periods following the issuance by the Company of financial statements that required restatement, and awarding reimbursement of said sums by these Individual Defendants to the Company;

C.     Declaring and determining that Individual Defendants Levy and Sanders breached their fiduciary and common law duties owed to Sportsline to refrain from trading in the Company's common stock on the basis of material, non-public information, and further, that Levy and Sanders are liable and must account to Sportsline for any and all profits they unlawfully derived from such trades;

D.     Awarding damages and other relief for the Company, including recovery of incentive compensation wrongfully paid to Individual Defendants Levy and Sanders, and all costs including legal and accounting fees, and other

*Verified Shareholder Derivative Complaint*

expenditures Sportsline has incurred and will incur in connection with the class actions referred to, *supra*;

E.      Directing that the Individual Defendants establish and maintain effective corporate therapeutic and compliance programs to ensure that Sportsline's directors, officers, and employees do not engage in wrongful and illegal practices and to ensure proper corporate governance at the Company in the future;

F.      Awarding monetary damages against all Individual Defendants, jointly and severally, in favor of the Company for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgement and post-judgement interest at the maximum legal rate;

G.      Awarding monetary damages and directing that Sportsline have contribution and indemnification from each of the Individual Defendants in connection with all such damages arising from the claims that have been asserted against Sportsline by virtue of the Individual Defendants' misconduct;

H.      Awarding plaintiff the costs, expenses, and disbursements incurred in this action;

I.      Awarding punitive damages against the Individual Defendants, jointly and severally, in favor of the Company, in an amount to be determined at trial, together with pre-judgement interest at the maximum legal rate; and

J.      Awarding plaintiff such other and further relief as the Court may deem just and proper in light of the circumstances of this case.

*Verified Shareholder Derivative Complaint*           - 30 -

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by jury.

DATED: October 2 9, 2003                    Respectfully submitted,

                                            **Marks & Artau, P.A.**


                                            _Jeffrey A Marks_
                                            JEFFREY S. MARKS, ESQ.
                                            9499 Glades Road,  Suite 308
                                            Boca Raton, FL 33431
                                            Telephone: (561) 416-9801
                                            Telefax: (561) 416-9805
                                            FLORIDA BAR NUMBER: 904279

                                            **EMERSON POYNTER LLP**
                                            John G. Emerson
                                            830 Apollo Lane
                                            Houston, TX 77058
                                            Ph: 281.488.8854
                                            Fax: 281.488.8867

                                            **EMERSON POYNTER LLP**
                                            Scott E. Poynter
                                            P.O. Box 164810
                                            Little Rock, AR 72216-4810
                                            Ph:  501.907.2555
                                            Fax:  501.907.2556

                                            **FEDERMAN & SHERWOOD LLP**
                                            William B. Federman
                                            120 N. Robinson, Ste. 2720
                                            Oklahoma City, OK 73102
                                            Ph: 405.235.1560
                                            Fax: 405.239.2112

                                            - and -

                                            2926 Maple Ave., Ste. 200
                                            Dallas, Tx. 75201

                                            **Counsel for Plaintiff**

_Verified Shareholder Derivative Complaint_                    - 31 -

## VERIFICATION

I am the Plaintiff in this shareholder derivative action and I was a Sportsline Com Inc. shareholder during all of the relevant times that the events alleged to have taken place in this Complaint occurred. Also, I continue to hold my shares. I believe the factual allegations in the Complaint to be true based upon my own personal knowledge and my counsel's investigation. Having received a copy of this Complaint, having reviewed it with my Counsel, I hereby authorize its filing.

**RICHARD MEYER**

**03-22889**

JS 44 (Rev. 3/99)

**CIVIL COVER SHEET** CIV - GOLD

MAGISTRATE JUDGE
SIMONTON

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Richard Meyer, Derivatively on behalf of Nominal
Defendant, Sportsline Com Inc.

**(b)** County of Residence of First Listed Plaintiff **Kane County, Illinois**
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS** Michael Levy, Kenneth W. Sanders,
Gerry Hogan  McManus, Michael P. Schulhof,
Joseph Lacob, Andrew Nibley, James C. Walsh
Thomas Cullen, Richard B. Horrow & Russell Pillar

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**Dade County, Florida**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jeffrey S. Marks, Esq., Marks & Artau, P.A.
2499 Glades Rd, Suite 308, Boca Raton FL 33431

Attorneys (If Known)

Unknown

1: 2003 CV 22889-

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** ☐ 310 Airplane | **PERSONAL INJURY** ☐ 362 Personal Injury Med. Malpractice | ☐ 610 Agriculture ☐ 620 Other Food & Drug | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment ☐ 410 Antitrust |
| ☐ 120 Marine ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers' | Product Liability ☐ 368 Asbestos Personal Injury Product | ☐ 630 Liquor Laws ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** ☐ 820 Copyrights | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted | Liability ☐ 340 Marine | Liability **PERSONAL PROPERTY** | ☐ 650 Airline Regs. ☐ 660 Occupational | ☐ 830 Patent ☐ 840 Trademark | ☐ 810 Selective Service ☐ 850 Securities/Commodities/ |
| Student Loans (Excl. Veterans) ☐ 153 Recovery of Overpayment | ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle | ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal | Safety/Health ☐ 690 Other | **SOCIAL SECURITY** | Exchange ☐ 875 Customer Challenge 12 USC 3410 |
| of Veteran's Benefits ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | Property Damage ☐ 385 Property Damage | **LABOR** | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act |
| ☐ 190 Other Contract ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation ☐ 220 Foreclosure | ☐ 441 Voting ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to |
| ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations ☐ 444 Welfare | **Habeas Corpus:** ☐ 530 General ☐ 535 Death Penalty | ☐ 740 Railway Labor Act ☐ 790 Other Labor Litigation | ☒ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS - Third Party | Justice ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act | 26 USC 7609 | ☒ 890 Other Statutory Actions |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

15 U.S.C. Section 1117 and 15 USC Sec. 7243 (Sarbanes-Oxley Act); Shareholder Derivative Claim

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions)
JUDGE **Donald M. Middlebrooks**
DOCKET NUMBER **03-CV-61849**

DATE **October 29, 2003**
SIGNATURE OF ATTORNEY OF RECORD
Jeffrey S. Marks, Esq.

FOR OFFICE USE ONLY
RECEIPT # 719325   AMOUNT 150.00   APPLYING IFP   JUDGE Gold   MAG JUDGE Simonton

JC42        3C6M